IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF DYLAN L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DYLAN L., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

AYANNA L., APPELLANT.

Filed April 5, 2022.   No. A-21-712.

Appeal from the Separate Juvenile Court of Douglas County: MARY M.Z. STEVENS, Judge. Affirmed.

Rachael A. Smith, of Smith Law, P.C., L.L.O, for appellant.

Cara Stirts, Deputy Douglas County Attorney, and Traemon Anderson, Senior Certified Law Student, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Ayanna L. appeals the order of the Douglas County Separate Juvenile Court terminating her parental rights. Ayanna contends that the juvenile court erred in finding (1) by clear and convincing evidence that she substantially and continuously or repeatedly neglected her child and finding that reasonable efforts to preserve and reunify have failed to correct the conditions leading to the adjudication; (2) that termination of her parental rights was in her child's best interests; and (3) that continued visitation between Ayanna and her child was not in the minor child's best interests. For the reasons set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

Ayanna is the natural mother of Dylan L. who was born in May 2012. The parental rights of Dylan's father have been terminated and he is not a party to this appeal. Dylan's father will be mentioned only as necessary for context.

In February 2018, an intake was received by the Nebraska Child Abuse and Neglect Hotline alleging that Ayanna was using marijuana, disciplining Dylan by shooting him with a BB gun, and that there was no food in the home. Dylan was removed from Ayanna's home on February 8. That same day, the State filed an adjudication petition alleging that Dylan was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to Ayanna's use of drugs and/or alcohol which placed Dylan at risk for harm; that Ayanna failed to provide proper parental care, support, and/or supervision for Dylan; that Ayanna failed to provide safe, stable, and/or appropriate housing for Dylan; and that these conditions placed Dylan at risk for harm.

In March 2018, the juvenile court adjudicated Dylan as a child within the meaning of § 43-247(3)(a) based upon Ayanna's admission to the allegations in the State's petition that her use of drugs and/or alcohol placed Dylan at risk for harm and that she failed to provide proper parental care, support, and/or supervision for Dylan.

In April 2018, following a dispositional hearing, the juvenile court ordered Ayanna to complete a psychological and a psychiatric evaluation, participate in residential treatment, submit to random urinalysis testing as requested by the case manager, participate and complete classes through the Women's Center for Advancement, and complete a parenting class. In subsequent orders, the juvenile court further ordered Ayanna to follow the recommendations outlined in the psychiatric and psychological evaluations; complete an updated chemical dependency evaluation and follow the recommendations; complete "Family Works" and follow the discharge recommendations; complete the Circle of Security parenting class; obtain and maintain a legal source of income and provide proof of income and employment to the case manager on a monthly basis; obtain and maintain safe and stable housing; participate in Dylan's educational programming and medication management; consistently participate in supervised and/or unsupervised visitation and/or communicate ahead of time with the visitation specialist and the case manager when unable to attend; not allow unauthorized individuals to be present during parenting time with Dylan unless approved by DHHS; participate in Parent/Child Interactive Therapy (PCIT) until successfully discharged; consult with the PCIT provider to develop concrete, verifiable expectations and goals to be practiced during parenting time with Dylan, as Dylan's behaviors consistently exhibit the need for Ayanna's active, constant involvement in his behavioral education and training; participate in at least three 12-step meetings per week until beginning treatment; submit to all random drug screens; comply with medication management recommendations, take medications as prescribed and provide proof of prescribed medications to the case manager and drug and alcohol testing professionals; abstain from the use of illegal drugs, alcohol, and medications not prescribed by a licensed physician; and participate in relinquishment counseling.

In February 2021, the State filed a motion to terminate Ayanna's parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016), and alleged that termination was in

- 2 -

Dylan's best interests. The motion further alleged that, pursuant to § 43-292(6), reasonable efforts to preserve and reunify the family, if required, under the direction of the court, have failed to correct the following conditions leading to adjudication:

> A. Ayanna . . . failed to participate in [PCIT] until successfully discharged.
>
> B. Ayanna . . . failed to abstain from the use of illegal drugs, alcohol and medications not prescribed by a licensed physician;
>
> C. Ayanna . . . failed to submit to random weekly drug and alcohol testing and comply with all testing provisions;
>
> D. Ayanna . . . failed to submit to an updated chemical dependency evaluation and follow the recommendations;
>
> E. Ayanna . . . failed to obtain and maintain a legal source of income; [and]
>
> F. Ayanna . . . failed to comply with medication management recommendations.

The termination hearing was held over two days in May and August 2021. The State adduced testimony from witnesses including Heather Peterson, a case manager since November 2020; Joaquin Guerrero Jr., visitation worker; Dr. Jordan Thayer, Dylan's psychologist; Rodney Burger, Dylan's therapist; and Dylan's foster mother.

The evidence established that Dylan has special needs and has been diagnosed with attention deficient disorder, hyperactivity, oppositional defiant disorder, and mood disruption. He also has ongoing behavioral issues including punching holes in the wall, breaking a ceiling fan, breaking his bunkbed, and running away after climbing out of a window. Dylan has an individualized education plan (IEP) at school and takes four different medications to help his behaviors and his sleep. At the time of the termination hearing, Dylan had been in out-of-home placements for 3 years and 3 months.

Petersen testified that in her role as case manager, she conducts monthly face-to-face visits with parents, children and providers; creates case plans; performs safety and risk assessments; assists parents in setting up and participating in court-ordered services such as visitation, evaluations, and therapy; monitors parents' compliance with court-ordered services; prepares case plans and court reports; and determines appropriate permanency objectives. Peterson stated that she contacted Ayanna at least monthly through face-to-face meetings, telephone, and texting, and Ayanna has been "good at responding." Further, Ayanna had completed a psychological evaluation and had been diagnosed with depression, anxiety, post-traumatic stress disorder, and cocaine and marijuana use disorder.

Peterson testified that, at the time of the termination hearing, Ayanna was subject to court orders requiring her to, among other things, (1) complete PCIT until successfully discharged; (2) complete a chemical dependency evaluation and follow the recommendations; (3) provide safe, suitable, and stable housing; (4) obtain a legal source of income; (5) participate in supervised and unsupervised visitation; (6) comply with medication management; and (7) abstain from drugs, alcohol, or medications that were not prescribed by a medical physician and participate in drug testing.

## 1. THERAPY/PCIT

The juvenile court ordered Ayanna to complete PCIT until successfully discharged. According to Peterson, "[w]ith Dylan's behaviors, PCIT is very important for helping to manage those behaviors. And with [Ayanna's] inconsistency of attending PCIT, that consistent structure isn't available to him then."

According to Peterson, from January to September 2019, Ayanna and Dylan participated in PCIT. Peterson stated that Ayanna was "pretty consistent" during February and March but failed to attend most of her PCIT appointments in April. Peterson also indicated that Ayanna attended most appointments in May, but only attended one appointment during June and July.

In September 2019, Ayanna and Dylan began participating in PCIT through a new provider. From September through May 2020, Ayanna participated consistently, but missed all of her appointments in June 2020. At that time, Ayanna and Dylan's PCIT therapist resigned. In September 2020, Ayanna and Dylan resumed therapy with Dr. Thayer.

### (a) Dr. Jordan Thayer

Dr. Thayer, a psychologist, testified that he had appointments with Dylan every other week providing

> parent management or parent consultation training. It's a standard approach, when working with parents for children often below the ages of 13, on helping them to guide and teach appropriate behaviors in (indiscernible) the environments based upon what is needed and appropriate. And this term, in this case, is defined as what is wanted by the parent. And then, providing just ongoing consultation, regular assessment, and problem-solving around how to continue to teach and support those behaviors.

Dr. Thayer testified that Dylan's goals were a reduction in the destruction of property, a reduction of "blow outs" in school and his foster home, and increasing use of emotional regulation. Although Ayanna was invited to participate in all of Dylan's sessions, she did not attend any sessions between September and December and only attended a total of three sessions. Therapy sessions with Dr. Thayer were ended January 2021 because he was not certified as a PCIT therapist.

### (b) Rodney Burger

Burger has been Dylan's therapist since September 2020, for trauma-focused cognitive behavioral therapy. Burger testified that he saw Dylan every other week to address issues of severe emotional disturbances, destruction of property, and physical and verbal aggression. Specifically, Dylan was behaviorally acting out at school and foster care, was not listening to authorities, and was not responding to redirection. Dylan's specific goals included listening and following directions; accepting "no"; accepting consequences; and working on anger management. He stated that, at the beginning of therapy, Dylan was "very non-talkative" and "[w]ould only respond in one or two words. But now, he is quite the chatterbox." According to Burger, Dylan has made "steady progress" on most of his goals but "still has a lot of work to be done with anger management and the acting out." Burger further noted that "[t]he acting out behaviors and the

extreme anger and the raging that [Dylan] engages in . . . usually happens directly after visitation with [Ayanna]" and that Dylan made more progress when visits with Ayanna decreased.

Burger also stated that both his office and the foster mother reached out to Ayanna, but Ayanna's response was "that she had no desire to participate." Ayanna's lack of participation in Dylan's therapy concerned Burger because Dylan mentioned "that he believed that [Ayanna] didn't care and that she was leaving him" which was detrimental to Dylan's progress because Dylan loves Ayanna and tries to defend her. Dylan also reported that, during visits with Ayanna, he plays video games most of the time.

### 2. CHEMICAL DEPENDENCY EVALUATION AND RECOMMENDATIONS

The juvenile court ordered Ayanna undergo a chemical dependency evaluation and follow the recommendations outlined in the evaluation. Ayanna completed a chemical dependency evaluation in March 2018 which recommended inpatient residential treatment. Due to the lack of available beds for inpatient treatment, Ayanna was placed on a waiting list at certain facilities. According to Peterson, Ayanna was removed from one waiting list for failing to maintain contact with the facility. Further, although she was accepted at another treatment facility that had availability, Ayanna failed to enter treatment at that time.

In August 2018, Ayanna entered inpatient treatment at "Family Works." Family Works is an intermediate residential program designed to help women who are either pregnant, parenting, or working to reunify with their children and who have issues related to addiction and mental health. Participation in the program involves a minimum of 30 hours of programming per week which includes programs such as helping women recover; Seeking Safety, which is focused on healing from trauma and substance use; Circle of Security; parenting groups; relapse-prevention groups; 12-step meetings; and various groups to promote self-sufficiency. The program also requires participants to participate in individual and group therapy, submit to drug testing three times per week, commit to safety, agree not to use drugs, and have a willingness to be in the program and change. The average stay at the program is 6 to 7 months.

During Ayanna's stay at Family Works, Dylan was in Ayanna's care for approximately one week. During that time, Dylan exhibited behavioral concerns including hitting, biting, breaking glass, and failing to respond to Ayanna. After it was determined that Dylan's needs were "too intense" for the program, Dylan was asked to leave and he was transitioned back into his foster home. At the same time, the program recommended that Ayanna locate another inpatient level of care, but Ayanna "was ambivalent about being in that level of care" and left the program in October 2018 despite not being discharged.

In December 2018, Ayanna entered the Lydia House program, which is a five-month program for addiction and recovery, but left a few days later. Ayanna returned to Lydia House in February 2019. While at Lydia House, Ayanna had issues with complying with rules including that she returned to the center intoxicated on two occasions and she was not fully participating in the program. In June, Ayanna was removed from the program for repeatedly breaking program rules, returning late from a pass, and consuming alcohol during programming. Ayanna began treatment in another program in August 2019, but voluntarily left treatment in order to move into her own apartment.

Peterson testified that Ayanna completed an updated chemical dependency evaluation in November 2020 which recommended that Ayanna complete a parenting class; complete level-one outpatient treatment; take medications as prescribed; and find a sober support group and individual therapy for mental health, anxiety and depression. Peterson testified that Ayanna had not satisfactorily completed the court's order for her to follow the recommendations of a chemical dependency evaluation including that she did not complete a parenting class; did not provide documentation showing that she had participated in level-one outpatient drug treatment; did not provide proof that she was participating in a sober support group; and did not provide proof that she was participating in individual therapy. Peterson further testified that, during the course of the case, Ayanna did not complete an inpatient program as recommended by the chemical dependency evaluation.

### 3. HOUSING

Regarding the requirement that Ayanna provide safe, suitable and stable housing, Petersen testified that Ayanna had obtained an apartment which appeared to be safe and clean. However, Peterson expressed concern regarding the stability of that situation because Ayanna's rent was being paid by various community resources and organizations and Ayanna did not have any long-term plans about how she would continue to afford that apartment.

### 4. LEGAL SOURCE OF INCOME

Regarding the court's order requiring Ayanna to obtain a legal source of income, Peterson testified that, although Ayanna does not have any diagnosed disabilities that prevent her from working, Ayanna had not found a job and never provided proof that she maintained a legal source of income. This failure prevented Ayanna from providing for Dylan's basic needs including clothing, food, and housing.

### 5. VISITATION

Regarding the requirement that she participate in visitation with Dylan, Ayanna participated in unsupervised overnight visits from August to October 2018, but thereafter, her visits had been a mix of supervised and unsupervised visitation. No overnight visits were allowed after July 2020 pursuant to court order. Since December 2020, Ayanna's visits were supervised and, although Ayanna's attendance at those visits were generally described as "good," there were concerns that, during those visits, Ayanna allowed unauthorized individuals to be present during the visits, allowed Dylan excessive screen time, discussed the case with Dylan, allowed Dylan to have multiple unauthorized phone calls with his father, and left the visitation worker and Dylan in her home. In March 2021, Ayanna's visitations were reduced to one supervised visit per week due to Ayanna continuing to allow unauthorized individuals to be present during visits.

Guerrero, the visitation specialist, testified that, from June 13 to September 3, 2019, he supervised 12 of Ayanna's visits with Dylan. According to Guerrero, Ayanna had one visit per week and "usually participated well." However, Guerrero stated that there were issues with Ayanna whispering to Dylan, allowing people who had not been approved by the case manager to interact with Dylan, and that there were instances when Ayanna did not respond well to redirection.

In one such instance, Ayanna refused to stop smoking while inside and would not move outside while smoking which required Guerrero to terminate that visit.

### 6. MEDICATION MANAGEMENT

As part of the court's order, Ayanna was required to participate in medication management which included taking medications as prescribed. According to Peterson, although Ayanna regularly participated in medication management, when Peterson looked at Ayanna's pill bottles, there were more pills remaining than there should have been if Ayanna was taking her medication as prescribed.

### 7. ABSTENTION FROM DRUGS, ALCOHOL, AND NON-PRESCRIBED MEDICATIONS AND DRUG TESTING

Ayanna was initially referred for drug testing in February 2018. Ayanna was unsuccessfully discharged from drug testing due to lack of participation in May 2018, April 2019, and November 2020. From February 2018 until the termination hearing, Ayanna had been scheduled to complete 178 drug tests. Of those, she completed 112 tests and missed 66 tests. An exhibit referencing Ayanna's drug testing set forth that, during the pendency of this case, Ayanna had presumptively tested positive for marijuana, amphetamines, methamphetamines, cocaine, and alcohol. Peterson testified that Ayanna admitted to using marijuana in November and December 2020 and was not participating in drug testing during that time. In April and May 2021, Ayanna tested positive for marijuana, alcohol, and cocaine.

### 8. BEST INTERESTS

#### (a) Peterson

Peterson testified that, when recommending termination of parental rights, she considers factors including length of time in care, progress in complying with court orders, and other case professionals' recommendations. Peterson testified that it was her opinion that termination of Ayanna's parental rights was in Dylan's best interests even though Ayanna and Dylan had a strong relationship. She based her opinion on multiple factors including that Dylan had been in out-of-home care for just over three years and, throughout the case, Ayanna had failed to follow court orders, tested positive for drugs, failed to obtain a legal source of income or stable housing, and failed to participate in Dylan's medical appointments, therapy appointments, and IEP meetings. She also stated that Ayanna was unable to provide for Dylan's basic needs. Peterson testified that Dylan needs consistency, structure, and "to be in a safe atmosphere with a protective parent" and that "Dylan needs a sober parent."

#### (b) Foster Mother

Dylan's foster mother testified that Dylan was placed with her on January 5, 2019, and he had continually been in her care for 2 years and 4 months. The foster mother stated that she began to see improvements in Dylan's behaviors in March 2021 when Ayanna's visits were decreased to one visit per week and that Dylan's behaviors at school had improved since visits were decreased. Additionally, she stated that, since visits were decreased in March, Ayanna had missed two visits

because she failed to call the visitation worker and confirm the visits. The foster mother noted that Dylan was hyper and had a difficult time following visits where Ayanna would give him sweets and, although she addressed her concerns with Ayanna, Ayanna would still give Dylan sweets, and that, sometimes after visits, Dylan was defiant and told his foster mother that "he's not going to listen to [her]."

### (c) Rodney Burger

Burger, Dylan's therapist, described the concept of permanency to mean "living in a safe, structured environment with boundaries, rules, expectations, and a lot of love." He further testified that is was important for children to live in that type of environment because "[i]t gives them a sense of security, of belonging, and of being loved." He expressed that, based upon his years of practice, it was his opinion that terminating Ayanna's parental rights was in Dylan's best interests because Dylan needs permanency and that Dylan's foster mother "provides all that structure, and [Dylan] is positively responding to that" and Ayanna "is not capable of providing them to him." Burger also opined that termination of Ayanna's parental rights "would give [Dylan] a sense of stability and drastically help him reduce his aggression." Burger also stated that, in his professional opinion, allowing visitation between Ayanna and Dylan after a termination order "would confuse the heck out of [Dylan] and could, actually be a detriment to his best interest[s]."

### 9. JUVENILE COURT ORDER

In August 2021, the juvenile court terminated Ayanna's parental rights pursuant to its finding, by clear and convincing evidence, that Dylan was a child within the meaning of § 43-292(2), (6), and (7); that Ayanna was unfit to parent; and that termination was in Dylan's best interests. The court also denied a previously filed motion by Ayanna to continue visitation with Dylan during the appeal process if her parental rights were terminated.

## III. ASSIGNMENTS OF ERROR

Ayanna contends that the juvenile court erred in finding (1) by clear and convincing evidence that she substantially and continuously or repeatedly neglected her child and in finding that reasonable efforts to preserve and reunify have failed to correct the conditions leading to the adjudication; (2) that termination of her parental rights was in her child's best interests; and (3) that continued visitation between Ayanna and Dylan during the appeal was not in Dylan's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

V. ANALYSIS

## 1. STATUTORY BASIS FOR TERMINATION

Ayanna first contends that the juvenile court erred in terminating her parental rights pursuant to § 43-292(2) and (6). She does not contest the termination of her parental rights pursuant to § 43-292(7).

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). The State must prove these facts by clear and convincing evidence. *Id.*

Section 43-292(7) grants termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This subsection operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra.* As stated above, Joseph provides no assignment of error or argument that the juvenile court erred in finding there were grounds to terminate under this statutory subsection.

In this case, Dylan was removed from Ayanna's home on February 8, 2018. At the time of the October 19, 2020, filing of the petition to terminate Ayanna's parental rights, Dylan had been in out-of-home placement for 32 months except for about one week Dylan was in Ayanna's care at some point between August and October 2018 during her treatment at Family Works, and had consecutively been in out-of-home care for at least 24 months. At the time of the first day of the termination hearing in May 2021, Dylan had been in out-of-home placement for 39 months and in consecutive out-of-home placement for at least 31 months.

Because we find that there was clear and convincing evidence that Dylan remained in out-of-home care for 15 or more months out of the most recent 22 months, we need not consider whether termination was proper based on the remaining statutory grounds. If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al., supra*.

## 2. BEST INTERESTS

Ayanna next argues that the juvenile court erred in finding that termination of her parental rights was in Dylan's best interests.

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015); *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *In re Interest of Jahon S., supra*. There is a

rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

The best interest analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

In cases where termination of parental rights is based on § 43-292(7), the Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is, in fact, in the child's best interests. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). In such a situation, because the statutory ground for termination does not require proof of such matters as abandonment, neglect, unfitness, or abuse--as the other statutory grounds require--proof that termination of parental rights is in a child's best interests requires clear and convincing evidence of circumstances as compelling and pertinent to a child's best interests as those enumerated in the other subsections of § 43-292. *In re Interest of Aaron D., supra*.

Here, Dylan was 9 years old at the time of the termination hearing and had not been in Ayanna's care for over three years, or 1/3 of his life. It is apparent to this court that Ayanna and Dylan love each other. However, during the time that this case has been pending, Ayanna has been unable to place herself in a position to parent Dylan. It is clear that Ayanna suffers from drug addiction. She failed to consistently submit to random drug and alcohol testing missing many of her tests. Further, during the pendency of this case, her drug screens have tested presumptively positive for marijuana, amphetamine, methamphetamine, cocaine, and alcohol. Ayanna did not successfully complete recommended inpatient treatment to deal with these issues and, in a letter Ayanna wrote to the juvenile court, which was admitted into evidence, Ayanna admitted that she was still using marijuana at the time of the termination hearing.

Ayanna failed to consistently participate in PCIT which the juvenile court deemed necessary for Ayanna to deal with Dylan's behaviors. She also failed to consistently attend Dylan's medical appointments, therapy appointments, or IEP meetings. And, due to Ayanna's failure to obtain stable and legal employment, she has failed to place herself in a position to provide for Dylan's basic needs. We also note that, during visits with Dylan, Ayanna allowed unauthorized individuals to be present, she allowed Dylan to have multiple unauthorized phone calls with his father, allowed Dylan excessive screen time, and left the visitation worker and Dylan in her home. The evidence does not establish a continued improvement in parenting skills by Ayanna; to the contrary, Ayanna had ceased having overnight visits with Dylan after July 2020, and by March

2021, Ayanna's visitation was reduced to one supervised visit per week due to Ayanna allowing unauthorized individuals to be present during visits.

Further, the evidence established that, following visits with Ayanna, Dylan was defiant and his behaviors increased. However, after visits with Ayanna were decreased to one visit per week, Dylan's behaviors at school and at his foster home improved. The case manager testified that termination was in Dylan's best interests because Dylan had been in out-of-home placement for over three years during which time Ayanna failed to follow court orders; continued to use and test positive for drugs; failed to obtain a legal source of income; failed to consistently participate in Dylan's medical appointments, therapy appointments, and IEP meetings; and failed to place herself in a position to parent Dylan or to provide for his basic needs. The case manager stated that Dylan requires consistency, structure, and "to be in a safe atmosphere with a protective parent." Likewise, Dylan's therapist testified that terminating Ayanna's parental rights was in Dylan's best interests because Ayanna was "not capable" of providing him with a safe, structured environment. He recounted that a safe, structured environment is important because it gives them a sense of stability, security, belonging, and being loved.

Dylan deserves permanency and stability which Ayanna is either incapable of, or unwilling, to provide in the foreseeable future. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Accordingly, we agree with the juvenile court's determination that there was clear and convincing evidence to show that Ayanna is currently an unfit parent for Dylan and that termination of her parental rights was in Dylan's best interests.

### 3. MOTION FOR VISITATION

Ayanna's final assignment of error is that the juvenile court erred in finding that continued visitation between Ayanna and Dylan during the appeal was not in Dylan's best interests. "After parental rights have been terminated, visitation while an appeal is pending would not be in the best interests of children who already have been in limbo for months or years." *In re Interest of J.H. et al.*, 233 Neb. 338, 350, 445 N.W.2d 599, 607 (1989), quoting *In re Interest of Z.D.D. and N.J.D.,* 230 Neb. 236, 430 N.W.2d 552 (1988). See *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004) (juvenile court has authority, based upon its continuing jurisdiction over the children, to enter orders that are in children's best interests, including order with respect to continued contact with natural parent whose parental rights are being terminated).

Here, the evidence established that Dylan's negative behaviors increased after visits with Ayanna and that after Ayanna's visits were limited to one visit per week, Dylan's behaviors at his foster home and school improved. Further, Dylan's therapist opined that allowing visitation between Ayanna and Dylan after the court entered a termination order "would confuse the heck out of [Dylan] and could, actually be a detriment to his best interest." Based upon our de novo review of the record, the juvenile court did not err in refusing to grant Ayanna visitation during this appeal.

- 11 -

## VI. CONCLUSION

Having considered and rejected Ayanna's arguments on appeal, we affirm the juvenile court order terminating her parental rights.

AFFIRMED.